Justin Augustine
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
CA Bar No. 235561
Email: jaugustine@biologicaldiversity.org
Phone: (916) 597-6189
*Pro Hac Vice Application Pending*

Edward B. Zukoski
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO 80202
CO Bar No. 26352
Email: tzukoski@biologicaldiversity.org
Phone: (303) 641-3149
*Pro Hac Vice Application Pending*

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
## TUCSON DIVISION

| | |
|---|---|
| Center for Biological Diversity, a non-profit organization, and Maricopa Audubon Society, a non-profit organization, | Case No. _____ |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |
| v. | |
| U.S. Bureau of Land Management; and U.S. Fish and Wildlife Service, | |
| Defendants. | |

**INTRODUCTION**

1.    Plaintiffs Center for Biological Diversity ("Center") and Maricopa Audubon Society bring this action against the U.S. Bureau of Land Management ("BLM") and U.S. Fish and Wildlife Service ("the Service") for violations of the Endangered Species Act ("ESA") arising from BLM final agency actions authorizing domestic livestock grazing on seven federal public lands allotments along the Gila River in Arizona, including the issuance of term grazing permits, allotment management plans ("AMPs"), and allotment annual operating instructions ("AOIs").

2.    The Gila River is home to numerous ESA-listed species dependent on aquatic and riparian habitat, including Southwestern willow flycatcher ("Flycatcher") and Western yellow-billed cuckoo ("Cuckoo"). In carrying out their consultation duties pursuant to ESA section 7 for the seven individual grazing allotment authorizations challenged in this action, BLM and the Service have determined that the effects of domestic livestock grazing are not likely to adversely impact these species or adversely modify their designated critical habitat if certain conservation measures are adhered to. These determinations are primarily based on commitments to exclude cattle from grazing streamside habitat during much of the spring and summer (Flycatcher and Cuckoo breeding season) to comply with "habitat management guidelines." These guidelines direct BLM to protect suitable characteristics of habitat and manage riparian areas to allow for natural regeneration.

3.    In April and December 2022, the Center conducted intensive surveys of cattle impacts in riparian critical habitat for the Flycatcher and the Cuckoo on BLM-managed grazing lands within the Middle Gila River allotments. Contrary to the commitments made by BLM and Service through the ESA section 7 process, these surveys documented cattle present in Flycatcher and Cuckoo critical habitat during the non-grazing season, utilization beyond authorized allowances, soils disturbed and degraded, regeneration of new riparian tree cohorts nonexistent, and erosion prevalent. The Center compiled the findings of these surveys into an April 2023 notice letter provided to BLM and the Service. In April 2023, the Center conducted follow-up surveys to verify whether

BLM had remedied the unlawful grazing. BLM had not done so. The Center provided the results of these new surveys to BLM and the Service in its May 2023 notice letter addendum.

4.     The ESA places ongoing obligations on federal agencies to ensure that their actions do not jeopardize the continued existence of endangered species or adversely modify or destroy their designated critical habitat, including the duty to reinitiate section 7 consultations in four circumstances. 50 C.F.R. § 402.16(a)(1)-(4). Agencies must reinitiate and complete consultation, for example, "[i]f the amount or extent of taking specified in the incidental take statement is exceeded," when "[n]ew information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," or when "[t]he identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion." *Id*. § 402.16(a)(1)-(3).

5.     BLM and the Service were required to reinitiate and complete consultation when presented with evidence documenting extensive cattle use and damage within the Middle Gila River allotments in violation of the 2012 and 2018 biological opinions. Moreover, BLM's failure to exclude domestic livestock from designated critical habitat for the Flycatcher and the Cuckoo during the non-grazing season, or to take immediate corrective action to remedy these failures, and its failure to ensure compliance with the habitat management guidelines in the biological opinions, undermines BLM's and the Service's conclusions regarding the impact of those specific grazing allotment authorizations on listed species and their designated critical habitat, and triggers the specific reinitiation thresholds at 50 C.F.R. § 402.16(a).

6.     On April 10, 2023, Plaintiffs provided 60 days notice of intent ("April 2023 Notice") to file this suit pursuant to the citizen suit provision of the ESA, 16 U.S.C. § 1540(g), with respect to seven allotments (A-Diamond, Teacup Ranch, LEN, Cochran, Horsetrack, Myers, and Whitlow) managed by the Tucson Field Office of BLM's Gila

District. This April 2023 Notice contained scientific analysis of the survey data including dozens of photographic reference points.

7.    On May 1, 2023, the Center submitted an addendum ("May 2023 Notice Addendum") to their April 2023 Notice based on additional field surveys undertaken in April 2023, identifying additional and ongoing damage by livestock and the unauthorized grazing of livestock in areas within critical habitat when such grazing is prohibited.

8.    Neither BLM nor the Service responded in writing to these notice letters. The agencies have not resolved the ESA violations alleged in Plaintiffs' notice letters. Accordingly, Plaintiffs seek declaratory and injunctive relief to enforce the agencies' mandatory ESA requirements with respect to the seven Middle Gila allotments identified in this complaint.

**JURISDICTION AND VENUE**

9.    This Court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(c), (g) (action arising under ESA citizen suit provision); 5 U.S.C. §§ 701-706 (APA review of agency action and failure to act); and 28 U.S.C. § 1331 (federal question jurisdiction).

10.    The Court may grant the relief requested under the ESA, 16 U.S.C. § 1540(g); the Administrative Procedure Act (APA), 5 U.S.C. § 706(2); and 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief).

11.    Plaintiffs provided sixty days' notice of intent to file this suit pursuant to the ESA's citizen suit provision, 16 U.S.C. § 1540(g), by letters to BLM and the Service dated April 10, 2023, and May 1, 2023. Defendants have not acted to remedy their continuing ESA violations by the date of this complaint's filing. Therefore, an actual controversy exists between the parties under 28 U.S.C. § 2201.

12.    Venue is proper in the United States District Court for the District of Arizona pursuant to 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to the Center's claims occurred in this District. Venue is proper in the Tucson Division because the BLM office responsible for the management of the seven allotments

at issue resides in Tucson (Pima County), and because one of the Plaintiffs (Center for Biological Diversity) resides in Tucson.

## PARTIES

13.    Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a non-profit environmental organization dedicated to the protection of endangered species and wild places through science, policy, and environmental law. The Center is headquartered in Tucson, Arizona, with offices throughout the United States. The Center has more than 80,000 members and over a million supporters who are dedicated to the protection of endangered species and wild places and who believe that our national public lands are to be managed for the benefit of all Americans.

14.    The Center for Biological Diversity brings this action on its own behalf, and on behalf of its members who derive aesthetic, recreational, inspirational, spiritual, scientific, and educational benefits from the public lands and waters of the Middle Gila allotments, including the areas and habitat where threatened and endangered species may be found. The Center's members who have used and enjoyed, and intend to continue using and enjoying, the Middle Gila River allotments include, but are not limited to, Chris Bugbee and Robin Silver.

15.    The Center for Biological Diversity's members, including but not limited to Chris Bugbee and Robin Silver, use and enjoy the Middle Gila allotments, and in particular the riparian areas and the River itself, for a variety of purposes including hiking, photographing scenery and wildlife, viewing wildlife and wildlife sign, and engaging in other scientific and recreational activities. The areas of the Middle Gila allotments that the Center's members use and enjoy include specific areas where critical habitat for the Flycatcher and the Cuckoo have been designated, and where these birds may be found. The Center's members' use and enjoyment of these areas is significantly enhanced knowing that these threatened and endangered species are still likely to be present in these areas.

16.    Mr. Bugbee most recently visited this area on April 11, 2023, while hiking on the Arizona Trail (passage 16), which runs directly through the A-Diamond and LEN

allotments and is immediately adjacent to the other Middle Gila allotments at issue. Mr. Bugbee has visited these allotments annually since 2021, engaging in recreational wildlife watching and tracking, and collecting scientific data pertaining to rare endemic fauna. Mr. Bugbee plans to visit the area again in spring of 2024 to hike, raft, and explore.

17.    Mr. Silver has been visiting the Gila River riparian areas within the Middle Gila allotments since at least 2005, to enjoy hiking, photographing scenery and wildlife, viewing wildlife and signs of wildlife, and engaging in other scientific and recreational activities. Mr. Silver most recently visited the area in April 2023, and plans to return in the spring of 2024.

18.    The areas of the Middle Gila allotments that Mr. Bugbee, Mr. Silver, and other Center members intend to continue to use and enjoy are where critical habitat for the Flycatcher and the Cuckoo has been designated, and where these birds may still be found. The aesthetic, recreational, inspirational, spiritual, scientific, and educational interests of Mr. Bugbee, Mr. Silver, and other Center members have been and will continue to be adversely affected and irreparably injured if Defendants' ongoing violations of the ESA continue. These are actual, ongoing, concrete injuries caused by Defendants' ESA violations. The relief sought will redress these injuries.

19.    Plaintiff MARICOPA AUDUBON SOCIETY is a nonprofit organization with more than 3,000 members dedicated to the study and enjoyment of birds and other wildlife, and to the protection and restoration of habitat in the Southwest. Maricopa Audubon Society is run by volunteers and strives to protect and restore wildlife habitat through education and community involvement.

20.    Maricopa Audubon Society has undertaken ongoing efforts to protect habitats for imperiled species throughout the arid southwest. Maricopa Audubon has played a strong role in protecting endangered and threatened species in the southwest through public education efforts, field surveys, public field trips, and position papers. Maricopa Audubon has been intimately involved in riparian protection efforts throughout the Southwest since the 1950s. For example, on February 2, 1998, Maricopa Audubon was

a petitioner with the Center for Biological Diversity for federal endangered species listing protection for the Western yellow-billed cuckoo. This action resulted in designation of the Cuckoo as threatened by the Service on October 3, 2014. In addition, Maricopa Audubon conducts field trips with members of the organization and non-members from the general public to critical habitat areas of species listed under the ESA, including the Cuckoo.

21.    Maricopa Audubon Society brings this action on behalf of itself and its adversely affected members, including but not limited to Robin Silver. The educational, scientific, aesthetic, conservation, and recreational interests of Maricopa Audubon's members within the public lands and waters of the seven Middle Gila allotments, including Robin Silver, have been and continue to be harmed. Maricopa Audubon's members intend to continue using and enjoying the riparian areas and critical habitat within the seven Middle Gila Allotments, including the spring of 2024. Unless the Court grants the requested relief, Maricopa Audubon's members will continue to be adversely affected and irreparably injured by Defendants' failures to comply with the law. The requested relief would redress these injuries.

22.    Defendant UNITED STATES BUREAU OF LAND MANAGEMENT is an agency within the Department of the Interior, and has issued grazing authorizations including term grazing permits, AMPs, and AOIs. Like all federal agencies, BLM must comply with all applicable ESA requirements, including the ongoing duty to comply with ESA section 7 requirements in relation to those authorizations.

23.    Defendant UNITED STATES FISH AND WILDLIFE SERVICE is the agency within the Department of the Interior that is charged with implementing the ESA, and shares responsibility with the BLM for reinitiating and completing consultation under ESA section 7 in relation to the grazing authorizations.

**LEGAL BACKGROUND**

24.    The Congress enacted the Endangered Species Act in 1973 to provide "a program for the conservation of . . . endangered species and threatened species." 16 U.S.C. § 1531(b). The ESA, 16 U.S.C. §§ 1531-1544, is "the most comprehensive legislation for

the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Its fundamental purposes are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

25. To achieve these objectives, the ESA directs the Secretary of the Interior, through the Service, to determine which species of plants and animals are "threatened" and "endangered" and place them on the list of protected species. *Id*. § 1533. An "endangered" or "threatened" species is one "in danger of extinction throughout all or a significant portion of its range," or "likely to become endangered in the near future throughout all or a significant portion of its range," respectively. *Id*. § 1532(6), (20).

26. Once a species is listed, the ESA provides procedural and substantive protections to ensure the species' continued survival, and its ultimate recovery, including the designation of critical habitat, the preparation and implementation of recovery plans, the prohibition against the "taking" of listed species, and the requirement for interagency consultation. 16 U.S.C. §§ 1533(a)(3), 1533(f), 1536, 1538. "Critical habitat" is the area that contains the physical or biological features essential to the "conservation" of the species and which may require special protection or management considerations. *Id*. § 1532(5)(A).

27. ESA section 7(a)(1) requires each federal agency, in consultation with the Service, to carry out programs for the conservation of threatened and endangered species. 16 U.S.C. § 1536(a)(1). The ESA defines "conserve" and "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measure provided pursuant to this chapter are no longer necessary." 16 U.S.C. § 1532(3).

28. ESA section 7(a)(2) requires that "[e]ach Federal agency shall, in consultation with . . . [the Service], [e]nsure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered

species or threatened species or result in the destruction or adverse modification of [critical habitat]." *Id*. § 1536(a)(2). This section 7(a)(2) consultation process has been described as the "heart of the ESA." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011).

29.     The Service's regulations define an agency "action" to mean "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies." 50 C.F.R. § 402.02.

30.     During the consultation process, federal agencies must "use the best scientific and commercial data available." *Id*. § 1536(a)(2); 50 C.F.R. § 402.14(d).

31.     For each proposed action, the action agency must request from the Service whether any listed or proposed species may be present in the area of the proposed action. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(c). If listed or proposed species may be present in the project area, the action agency must prepare a "biological assessment" to determine whether the listed species may be affected by the proposed action. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12.

32.     If the action agency determines that its proposed action may affect any listed species or critical habitat, the agency must normally engage in "formal consultation" with the Service. 50 C.F.R. § 402.14. However, the agency need not initiate formal consultation if, as a result of the preparation of a biological assessment or as a result of informal consultation with the Service, the agency determines, with the written concurrence of the Service, that the proposed action is not likely to adversely affect any listed species or critical habitat. *Id*. §§ 402.13, 402.14(b)(1).

33.     To complete the formal section 7 consultation process, the Service must provide the action agency with a "biological opinion" explaining how the proposed action will affect listed species and/or critical habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14(h).

34.     If the Service concludes in the biological opinion that the proposed action is likely to jeopardize the continued existence of a listed species, or result in the destruction or adverse modification of critical habitat, the Service must suggest "reasonable and

prudent alternatives" to avoid those results. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2).

35.    If the Service concludes in the biological opinion that the action is not likely to jeopardize the continued existence of a listed species, or result in the destruction or adverse modification of critical habitat, the Service must provide an "incidental take statement" with the biological opinion, specifying the amount or extent of such incidental taking on the species and any "reasonable and prudent measures" that the Service considers necessary or appropriate to minimize such impact, and setting forth the "terms and conditions" that must be complied with by the action agency to implement those measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

36.    The reinitiation of formal consultation under the ESA is required and must be requested by the Service or the action agency for agency actions over which the action agency retains, or is authorized to exercise, discretionary involvement or control, if: (1) the amount or extent of taking specified in the incidental take statement is exceeded; (2) new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (3) the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence; or (4) a new species is listed or critical habitat designated that may be affected by the identified action. 50 C.F.R. § 402.16(a)(1)-(4).

37.    After the initiation or reinitiation of section 7 consultation, the action agency is prohibited from making "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2)." 16 U.S.C. § 1536(d).

# BACKGROUND

### A.    General Setting

38.    The Gila River originates in southwestern New Mexico and flows westward across Arizona to its confluence with the Colorado River north of Yuma. The "Middle" portion of the Gila watershed begins west of the Coolidge Dam. The San Pedro River flows into the Middle Gila River near Winkelman, AZ, approximately 20 miles west of Coolidge Dam, as the crow flies. The seven allotments at issue in this matter are west of the San Pedro-Gila River confluence.

39.    The Middle Gila is a narrow strip of moisture and greenery snaking through the otherwise arid Sonoran desert ecosystem. BLM's 1989 Phoenix Resource Management Plan (RMP) recognized the importance of the Middle Gila by designating nearly 1,500 acres of river and bottomland from the Florence-Kelvin Highway Bridge to the Ashurst-Hayden Dam as the "Gila River Riparian Management Area." BLM dedicated this "special management area" to "[i]mprov[ing] [the] condition of riparian vegetation and aquatic habitat for native fish; enhance[ing] water quality; [and] limit[ing] salinity discharges." The Gila River Riparian Management Area overlaps the seven allotments at issue in this case.

### B.    Livestock Grazing Threatens Riparian Values and Wildlife Habitat

40.    Scientific study on the impacts of livestock grazing on aquatic and riparian habitats in the Southwest is extensive and universally shows severe and lasting negative impacts such that complete exclusion of cattle is widely accepted as a minimum baseline management strategy in preserving stream health. Livestock grazing has both direct and indirect effects on streams, and is a leading cause of species endangerment in the Southwest, including the ESA-listed species within the Middle Gila River watershed.

41.    Livestock directly harm riparian habitat through removal of riparian vegetation. Loss of riparian vegetation in turn raises water temperatures, reduces bank stability, and eliminates an important structural component of the stream environment that contributes to the formation of pools.

42.     Grazing physically alters streambanks through trampling and shearing, leading to bank erosion. In combination, loss of riparian vegetation and bank erosion can alter channel morphology, resulting in downcutting and an increased width/depth ratio, all of which lead to a loss of pool habitats and shallow side and backwater habitats.

43.     Livestock also indirectly damage aquatic and riparian habitats by compacting soils, altering soil chemistry, and reducing vegetation cover in upland areas, leading to increased severity of floods and sediment loading, lower water tables, and altered channel morphology.

44.     One consequence of these impacts to watersheds is a reduction in the quantity and quality of pool habitat. A lowered water table, for example, results in direct loss of pool habitats, simply because water is not available to form pools. Increased erosion results in filling of pools with sediments. Channel incision and increased flood severity both can scour out pools, reducing habitat complexity and resulting in shallow, uniform streambeds, all of which harms the species at issue in this suit.

**C.      Fish and Wildlife Service Consultations Concerning the Impacts of Livestock Grazing on the Flycatcher and Cuckoo in the Middle Gila Allotments.**

45.     The Southwestern willow flycatcher (*Empidonax traillii extimus*, "Flycatcher") was listed as federally endangered in 1995, and received a recovery plan in 2002, and critical habitat designation in 2013.

46.     The Western yellow-billed cuckoo (*Coccyzus americanus occidentalis*, "Cuckoo") was listed as threatened under the ESA in 2014. The Service designated critical habitat for the Cuckoo on April 21, 2021, but has yet to complete a recovery plan.

47.     The Service formally designated the Gila River and adjacent riparian areas within the seven allotments on the Middle Gila Box as critical habitat for both the Cuckoo and the Flycatcher. *See* Figure 1, below.



*Figure 1. Middle Gila River Allotments and Critical Habitat for Flycatcher and Cuckoo*

48.     On May 21, 2012, the Service issued the "Biological Opinion on the Gila District Livestock Grazing Program" ("2012 Biological Opinion"). The 2012 Biological Opinion covered three previous livestock grazing consultations: (1) the programmatic biological opinion for the Safford/Tucson Field Offices' livestock grazing program; (2) the biological opinions for the Phoenix District Portion of the Eastern Arizona Grazing EIS and the Upper Gila-San Simon Grazing EIS; and (3) the biological opinion for livestock grazing on 18 allotments along the Middle Gila River Ecosystem, including the seven allotments at issue in this case. The 2012 Biological Opinion addressed impacts to the Flycatcher, but not the Cuckoo, which at that time had not yet been listed.

49.     The 2012 Biological Opinion found that "the proposed action may affect the southwestern willow flycatcher and its designated critical habitat." 2012 Biological Opinion at 1. The Service concluded that "it is the [Service's] biological opinion that the grazing program, as proposed, is neither likely to jeopardize the continued existence of the southwestern willow flycatcher, nor likely to destroy or adversely modify critical habitat"

because, among other things, "[l]ivestock have been excluded from flycatcher habitat …
during the breeding season," from April 1 to September 1. *Id*. at 16, 95.

50.    The 2012 Biological Opinion includes "conservation measures," which
"BLM *will* implement … to reduce the adverse effects to [ESA] listed species and critical
habitat from authorized livestock grazing," and which the Service relied upon to conclude
that livestock grazing within the seven allotments was "neither likely to jeopardize the
continued existence of the southwestern willow flycatcher, nor likely to destroy or
adversely modify critical habitat." 2012 Biological Opinion at 13 (emphasis added), 95.

51.    The general conservation measures, which were required to be implemented
for all livestock grazing actions, include: (1) submitting an annual monitoring report to the
Service, summarizing for the previous year the implementation and effectiveness of the
measures and documenting incidental take; (2) working to remove unauthorized livestock
from areas excluded or otherwise closed to grazing, including contacting the owner of the
livestock as soon as possible after the unauthorized use of livestock is reported and request
removal; (3) working as quickly as practical to repair exclosure fences or notify permittees
to repair fences; and (4) inspecting fences that are used for excluding livestock from
riparian areas on BLM-managed allotments before livestock are turned out. 2012
Biological Opinion at 14.

52.    The 2012 Biological Opinion also contains conservation measures identified
as "habitat management guidelines" specifically designed to protect the Flycatcher,
including:

> 2. Habitat Management Guidelines: The BLM will implement the
> following guidelines:
>
> a. Livestock grazing will be excluded within occupied and un-
> surveyed, suitable habitat during the breeding season (April 1-
> September 1).
>
> b. Manage suitable flycatcher habitat so that suitable characteristics
> are not eliminated or degraded.

14

c. Manage riparian areas to allow natural regeneration and, therefore, allow those sites with potential to progress into suitable habitat.

53.     The 2012 Biological Opinion's habitat management guidelines for the Flycatcher also require the following:

On BLM lands with suitable or potential willow flycatcher habitat, restrict livestock grazing on riparian vegetation to winter use only from November 1 to March 30, and monitoring will be done to ensure utilization levels do not exceed 30 percent limits on apical meristems of woody vegetation 0-6 feet tall (e.g. cottonwoods and willows). Monitoring will be done prior to, during, and after the livestock have used a riparian pasture.

The 2012 Biological Opinion does not explain why one measure limits livestock grazing in Flycatcher habitat to November 1 to March 30, while another limits livestock grazing to September 1 to March 30.

54.     With these conservation measures in place, the Service concluded that:

The recovery potential of critical habitat will not be compromised by the proposed action…. The BLM will manage the allotments that have or are near critical habitat to meet both Standard 1 (uplands) and Standard 2 (riparian). To accomplish this, the BLM will exclude livestock grazing in flycatcher habitat on BLM lands from April 1 to September 1 (the breeding season and most of the growing season), will manage livestock to enhance the survival of willow and cottonwood seedlings, and manage the uplands to maintain vegetative cover. These actions will meet the intent of the recovery plan for livestock management for flycatcher habitat and thus provide for the recovery of the flycatcher.

55.     The Service issued a Reinitiated Review and Conference on Eight Grazing Lease Renewals, Pinal County, Arizona on August 20, 2018 ("2018 Biological Opinion"). The 2018 Biological Opinion addressed the impacts of livestock grazing on three species, including the Cuckoo (but not the Flycatcher), within the seven allotments at issue in this case.

56.     The Service's 2018 Biological Opinion, in assessing the potential for adverse modification of Cuckoo habitat, concludes:

we anticipate that native riparian vegetation (i.e. Fremont cottonwood and/or Goodding willow) – and therefore, yellow-billed cuckoo habitat

15

and proposed critical habitat – will continue to be adversely affected by ongoing livestock grazing. We do not anticipate, however, that the proposed action will affect the existing riparian habitat to an extent that would measurably affect the current abundance of yellow-billed cuckoos and/or the recovery potential of the proposed critical habitat.

57.     The Service's 2018 conclusion concerning the anticipated impacts to Cuckoo habitat assume that BLM: (1) will apply numerous general conservation measures identified and adopted in the 2012 Biological Opinion; (2) will apply numerous conservation measures in the 2012 Biological Opinion meant to protect the Flycatcher; and (3) will establish a livestock "non-grazing" season in riparian areas of the allotments from April 1 to October 1.

58.     Specifically, the 2018 Biological Opinion states:

The proposed action incorporates several general conservation measures pertaining to riparian ecosystems (1, 4, 10, 12, 13-17, and 19; see p. 13-15 in the 2012 BO) as well as conservation measures that are intended to minimize the effects of livestock grazing to the endangered southwestern willow flycatcher (see the southwestern willow flycatcher conservation measures in the BE, pp. 17-18 and 1 through 7 on pp. 15-17 in the 2012 BO). The flycatcher-specific conservation measures implement the general guidelines for livestock grazing in southwestern willow flycatcher habitat that in Table 2 in the Southwestern Willow Flycatcher Recovery Plan (FWS 2002; Appendix G, pp. 26-27). These recommendations are suitable surrogates for yellow-billed cuckoo grazing standards until species-specific recommendations can be completed. We note that you [BLM] have agreed to implement a yellow-billed cuckoo-specific grazing season [sic, should be "non-grazing season"] of April 1 to October 1 (D. Tersey pers. comm. 2017).

2018 Biological Opinion at 9. *See also id.* at 11 ("We note that you have agreed to implement a yellow-billed cuckoo-specific *non-grazing season* of April 1 to October 1 (D. Tersey pers. comm. 2017)" (emphasis added)). The incorporated "conservation measures that are intended to minimize the effects of livestock grazing to the endangered southwestern willow flycatcher" include the measures identified in paragraphs 52-53, above.

59.     The 2012 Biological Opinion states that "anticipated incidental take from the proposed action will be exceeded if … [u]nauthorized livestock on BLM lands in flycatcher

16

habitat within the middle Gila River/lower San Pedro River areas are not removed as soon as possible during the nesting season, and this use occurs more than once during a nesting season." 2012 Biological Opinion at 103.

    **D.**    **The Center's 2022 and 2023 Surveys Documented Widespread and Significant Riparian Damage on Grazing Allotments within the Middle Gila River Watershed, and Other New Information.**

60.    Plaintiff Center for Biological Diversity conducted on-the-ground assessments in April and December 2022 to determine whether cattle were present within Middle Gila River watershed riparian areas that are purportedly excluded from cattle during the Flycatcher breeding season and non-grazing season established for Cuckoo (April 1 to at least September 1), and to assess the condition of Flycatcher and Cuckoo critical habitat. April 2022 surveys documented that livestock grazing in six of the seven allotments was occurring within Flycatcher and Cuckoo critical habitat outside of seasons authorized in the 2012 and 2018 biological opinions, and that some purported fencing exclusions were in disrepair or nonexistent.

61.    In conducting the assessments, field surveyors recorded livestock grazing impacts to riparian vegetation, soils, and streambanks, and documented the condition of exclosure and allotment boundary fencing. Data were collected in six categories and were scored based on the severity and frequency of impacts. Stream reaches and riparian habitat were analyzed and ranked with absent, light, moderate, or significant grazing impacts. All data is supported by georeferenced photographs documenting livestock presence and their impacts.

62.    The Center's surveys in April and December of 2022 covered approximately 15 miles of stream and riparian habitat within the seven allotments, from roughly the Kelvin Bridge in the east to Price, Arizona in the west. Observations of cattle impacts were collected for distinct riparian segments. Data were analyzed to reveal that 13.8 miles (92%) were significantly impacted (degraded) by livestock grazing.

63.    The Center documented the findings of its April and December 2022 surveys in the April 2023 Notice.

64.     Survey results and photos presented in the April 2023 Notice document that livestock grazing in the seven allotments was occurring within Flycatcher and Cuckoo critical habitat outside of seasons authorized in the 2012 and 2018 biological opinions and that some purported fencing exclusions were in disrepair or nonexistent.

65.     Survey results and photos presented in the April 2023 Notice also document that livestock grazing in riparian zones within the seven allotments is removing riparian vegetation in Flycatcher and Cuckoo habitat down to the roots, leaving bare ground and dust-bowl conditions, and resulting in very little riparian forest regeneration.

66.     Survey results and photos presented in the April 2023 Notice thus demonstrate that the condition of the seven allotments fails to comply with the 2012 Biological Opinion's mandate, also incorporated into the 2018 Biological Opinion, that BLM will "[m]anage suitable flycatcher habitat so that suitable characteristics are not eliminated or degraded," and will "[m]anage riparian areas to allow natural regeneration and, therefore, allow those sites with potential to progress into suitable habitat." 2012 Biological Opinion at 16.

67.     Survey results and photos presented in the April 2023 Notice demonstrate almost no cottonwoods and willows less than 6 feet tall remain, demonstrating that livestock grazing "exceed[s] 30 percent limits on apical meristems of woody vegetation 0-6 feet tall (e.g. cottonwoods and willows)," thus exceeding the utilization levels set in the 2012 Biological Opinion, and also incorporated into the 2018 Biological Opinion. 2012 Biological Opinion at 16.

68.     Survey results and photos presented in the April 2023 Notice demonstrate that livestock grazing is causing the destruction and adverse modification of critical habitat for the Flycatcher and the Cuckoo.

69.     Survey results and photos presented in the April 2023 Notice demonstrate that recent, large wildfires have eliminated large swaths of mature cottonwood gallery forest along the Middle Gila in at least two of the seven allotments at issue here (Cochran

and Myers), further reducing the chances of future riparian forest recruitment necessary for the Flycatcher's and Cuckoo's recovery.

70.     On information and belief, BLM has not taken corrective action in response to the April 2023 Notice, nor otherwise addressed the new information which has revealed effects of livestock grazing that may affect listed species or critical habitat in a manner or to an extent not previously considered.

71.     In April 2023, the Center conducted a follow-up survey on the seven allotments, documenting continued extensive damage and recent cattle impacts on those allotments. The Center documented the results of this April 2023 survey, and provided those results to BLM and the Service with its May 2023 Notice Addendum.

72.     Survey results and photos presented in the May 2023 Notice Addendum document that livestock grazing is occurring on all seven Middle Gila allotments within Flycatcher and Cuckoo critical habitat outside of seasons authorized in the 2012 and 2018 biological opinions.

73.     Survey results and photos presented in the May 2023 Notice Addendum document that livestock grazing is occurring on all seven Middle Gila allotments within Flycatcher and Cuckoo critical habitat after April 1, outside of seasons authorized in the 2012 and 2018 biological opinions. Surveyors reported observing more than 100 cattle within critical habitat for the Flycatcher and Cuckoo during their April 2023 survey. Survey results and photos presented in the May 2023 Notice Addendum documented numerous instances of downed/nonfunctional fences and gates left open, allowing livestock to access critical habitat during the non-grazing season set by the 2012 Biological Opinion.

74.     Survey results and photos presented in the May 2023 Notice Addendum document that surveyors' observations of no vegetative regrowth on innumerable cattle trails and wallows throughout the critical habitat designations along the Gila River.

75.     Survey results and photos presented in the May 2023 Notice Addendum thus demonstrate that the condition of the seven allotments fails to comply with the 2012 Biological Opinion's mandate, also incorporated into the 2018 Biological Opinion, that

BLM will "[m]anage suitable flycatcher habitat so that suitable characteristics are not eliminated or degraded," and will "[m]anage riparian areas to allow natural regeneration and, therefore, allow those sites with potential to progress into suitable habitat." 2012 Biological Opinion at 16.

76.    Survey results and photos presented in the May 2023 Notice Addendum demonstrate few cottonwoods and willows less than 6 feet tall remain in many areas across the seven allotments, demonstrating that livestock grazing "exceed[s] 30 percent limits on apical meristems of woody vegetation 0-6 feet tall (e.g. cottonwoods and willows)," thus exceeding the utilization levels set in the 2012 Biological Opinion, and also incorporated into the 2018 Biological Opinion. 2012 Biological Opinion at 16.

77.    Survey results and photos presented in the May 2023 Notice Addendum demonstrate also that livestock grazing is occurring on BLM-managed land outside of allotment boundaries, and is therefore unauthorized. For example, substantial bank degradation was documented along the northern shore of the Gila River, on public land that is not part of any grazing allotment, across from and outside of the A-Diamond and Teacup Ranch allotment boundaries, and within Flycatcher and Cuckoo critical habitat.

78.    Survey results and photos presented in the May 2023 Notice Addendum demonstrate that livestock grazing is causing the destruction and adverse modification of critical habitat for the Flycatcher and the Cuckoo.

79.    On information and belief, BLM has not taken corrective action in response to the May 2023 Notice Addendum, nor otherwise addressed the new information which has revealed effects of livestock grazing that may affect listed species or critical habitat in a manner or to an extent not previously considered.

80.    BLM and the Service committed in an August 11, 2022 settlement of litigation challenging the agencies' failure to reinitiate consultation concerning livestock grazing within the Gila Box Riparian National Conservation Area that "the Federal Defendants had reinitiated appropriate ESA consultation on the Gila District Livestock Grazing Program." Stipulated Settlement Agreement, *Center for Biological Diversity v.*

*U.S. Bureau of Land Management*, (D. Ariz. CV 21-411-TUC-RM (DTF)), Doc. 44-1 (Aug. 11, 2022) at 2. The Gila District Livestock Grazing Program includes the seven Middle Gila River allotments at issue in this case.

81.     On information and belief, BLM and the Service have failed to complete that reinitiated consultation.

## CLAIMS FOR RELIEF

### Claim I

**Failure to Reinitiate and Complete ESA Section 7 Consultation to Ensure Ongoing Livestock Grazing Does Not Jeopardize Listed Species or Destroy or Adversely Modify Critical Habitat**

*(ESA Violation of 16 U.S.C. § 1536(a)(2) and 50 C.F.R. § 402.16)*

82.     Plaintiffs incorporate all preceding paragraphs by reference.

83.     BLM has authorized and managed livestock grazing on seven Middle Gila grazing allotments (A-Diamond, Teacup Ranch, LEN, Cochran, Horsetrack, Myers, and Whitlow) through final agency actions including the issuance of term grazing permits, allotment management plans ("AMPs"), and allotment annual operating instructions ("AOIs").

84.     The 2012 and 2018 biological opinions prepared for the seven Middle Gila grazing allotments rely on excluding cattle from riparian areas from April 1 until at least September 1, as a primary means to ensure ESA compliance in relation to the Flycatcher and Cuckoo and their critical habitats. The 2012 and 2018 biological opinions did not consider impacts arising from repeated, unauthorized cattle grazing in these allotments between April 1 and September 1.

85.     The 2012 and 2018 biological opinions prepared for the seven Middle Gila grazing allotments further rely on livestock grazing complying with habitat management guidelines – including ensuring that suitable characteristics of riparian habitat are not eliminated or degraded, and ensuring that riparian areas are managed to allow natural

regeneration – as a means to ensure ESA compliance in relation to the Flycatcher and Cuckoo and their critical habitat.

86.    Plaintiff Center for Biological Diversity conducted on-the-ground assessments in 2022 and 2023 to determine whether cattle are present within the riparian areas and Flycatcher and Cuckoo critical habitat during the months when cattle are supposed to be excluded on the seven Middle Gila grazing allotments. These assessments, documented in the April 2023 Notice Letter and May 2023 Notice Addendum demonstrated that fencing was in some places in disrepair, and documented the presence of cattle during the non-grazing-season, as well as associated damage to riparian areas, contrary to the terms of the 2012 and 2018 Biological Opinions.

87.    The ESA places ongoing obligations on federal agencies to ensure that their actions do not jeopardize the continued existence of endangered species or adversely modify or destroy their designated critical habitat, including the duty to reinitiate section 7 consultation in four circumstances. 50 C.F.R. § 402.16(a)(1)-(4). Agencies must reinitiate consultation, for example,"[i]f the amount or extent of taking specified in the incidental take statement is exceeded," when "[n]ew information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," or when "[t]he identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion." *Id*. § 402.16(a)(1)-(3).

88.    The survey information that the Center provided to BLM and the Service in the April 2023 Notice Letter and May 2023 Notice Addendum documented extensively damaged, ineffective, or absent fencing and the presence of livestock within the seven Middle Gila grazing allotments in the non-grazing season as defined by the 2012 and 2018 biological opinions. These findings demonstrate exceedances and violations of the requirements and commitments made in the 2012 and 2018 biological opinions, and/or exceedances of the levels of permissible incidental take established in those Biological Opinions.

89.     The survey information that the Center provided to BLM and the Service in the April 2023 Notice Letter and May 2023 Notice Addendum also documented extensively damaged riparian areas with bare soil and little or no growth of riparian vegetation. These findings also demonstrate exceedances and violations of the requirements and commitments made in the 2012 and 2018 biological opinions concerning habitat management guidelines, and/or exceedances of the levels of permissible incidental take established in those Biological Opinions.

90.     BLM and the Service were required to reinitiate and complete consultation when presented with new information documenting extensive cattle use during periods when livestock are to be excluded per the 2012 and 2018 biological opinions, and documenting damage to riparian vegetation and critical habitat in excess of that permitted by the 2012 and 2018 biological opinions. BLM's failure in fact to exclude domestic livestock during the non-grazing season from designated critical habitat and failure to comply with the terms of the habitat management guidelines of the 2012 and 2018 biological opinion specifically triggered the reinitiation thresholds at 50 C.F.R. § 402.16(a). By failing to reinitiate and complete consultation despite the fact that the reinitiation criteria have been satisfied, BLM and the Service are in ongoing violation of 50 C.F.R. § 402.16.

91.     By failing to take effective actions to exclude livestock from these allotments during the non-grazing season, failing to ensure compliance with habitat management guidelines, failing to ensure incidental take is not exceeded, and failing to prevent the adverse modification of critical habitat, BLM is in ongoing violation of the substantive ESA section 7(a)(2) requirement that federal agencies ensure their actions are not likely to jeopardize the continued existence of any listed species or result in the destruction or adverse modification of designated critical habitat. 16 U.S.C. § 1536(a)(2).

92.     Plaintiffs and their members are injured by BLM's and the Service's violations of ESA section 7(a)(2) and failure to reinitiate and complete consultation.

93.     BLM's and the Service's violations of ESA section 7(a)(2) are subject to judicial review under the ESA citizen suit provision, 16 U.S.C. § 1540(g)(1), and/or the APA, 5 U.S.C. §§ 701-706.

<div align="center">

**Claim II**

**Unlawful Irreversible or Irretrievable Commitment of Resources**

**Pending Completion of Consultation**

(*ESA Violation of 16 U.S.C. § 1536(d)*)

</div>

94.     Plaintiffs incorporate all preceding paragraphs by reference.

95.     BLM failed to respond to the April 2023 Notice Letter and the May 2023 Notice Addendum. Cattle continue to access seasonally excluded riparian areas within the seven Middle Gila grazing allotments, even though BLM and the Service have determined that such exclusion is necessary to avoid jeopardizing listed species or the destruction or adverse modification of their designated critical habitat.

96.     Further, livestock grazing within the seven Middle Gila grazing allotments continues to occur in violation of habitat management guidelines set forth in the 2012 and 2018 biological opinions.

97.     ESA section 7(d) provides that once an agency initiates or reinitiates section 7 consultation, the agency "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2)." 16 U.S.C. § 1536(d). The purpose of section 7(d) is to prevent harm to endangered species and designated critical habitat pending the completion of section 7 consultation.

98.     BLM has failed to seasonally exclude cattle from riparian areas within Flycatcher and Cuckoo designated critical habitat within the seven Middle Gila grazing allotments, or to reduce livestock grazing to levels consistent with the habitat management guidelines of the 2012 Biological Opinion within those allotments, pending the completion of reinitiated consultation, in violation of ESA section 7(d), 16 U.S.C. § 1536(d).

99.   Plaintiffs and their members are injured by BLM's violations of ESA section 7(d).

100.   BLM's violations of section 7(d) of the ESA are subject to judicial review under the ESA citizen suit provision, 16 U.S.C. § 1540(g)(1), and/or the APA, 5 U.S.C. §§ 701-706.

### Claim III

### Failure to Develop and Implement a Program to Conserve Listed Species Impacted by the BLM's Grazing Program and Unauthorized Grazing

(*ESA Violation of 16 U.S.C. § 1536(a)(1)*)

101.   Plaintiffs incorporate all preceding paragraphs by reference.

102.   BLM has violated its affirmative obligation to "engage in" and complete "consultation with" the Service so as to "carry[] out programs for the conservation" of listed species impacted by its grazing program. 16 U.S.C. § 1536(a)(1). As detailed in this Complaint, permitted cattle are accessing streamside and riparian areas within Flycatcher and Cuckoo critical habitat during seasons when no livestock grazing is authorized, and is causing widespread and significant damage to habitat occupied by these ESA-listed species and their designated critical habitat.

103.   BLM's actions, if any, to remove unauthorized cattle from streamside and riparian areas on the seven Middle Gila grazing allotments that are purportedly excluded from livestock from April 1 until at least September 1 have been, at best, ineffectual. Fencing intended to exclude cattle is in some places in disrepair, or otherwise ineffective. BLM has not implemented adequate enforcement actions to compel corrective action. Consequently, cattle continue to access streamside and riparian areas that are purportedly excluded from such cattle from April 1 until at least September 1, and livestock grazing continues to result in violations of habitat management guidelines set in the 2012 and 2018 biological opinions, and to adversely modify critical habitat.

104.   Even if BLM were successful in excluding cattle from seasonally excluded streamside and riparian areas of critical habitat, the agency has failed to develop and

implement, in consultation with the Service, corrective measures for mitigating the extensive damage livestock grazing has caused to the Flycatcher and Cuckoo and/or their designated critical habitat on the seven Middle Gila grazing allotments. 16 U.S.C. § 1536(a)(1). BLM's failure to "utilize [its] authorities . . . by carrying out programs for the conservation of endangered species" in consultation with and with the assistance of the Service violates section 7 (a)(1) of the ESA. *Id.*

## REQUEST FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court:

1.    Declare that BLM and the Service are violating ESA section 7(a)(2) and 50 C.F.R. § 402.16 by failing to reinitiate and complete consultation on the seven livestock grazing allotments in the Middle Gila River watershed (including the A-Diamond, Teacup Ranch, LEN, Cochran, Horsetrack, Myers, and Whitlow allotments) in order to ensure that livestock grazing activities on those allotments do not jeopardize the continued existence of listed species, including the Flycatcher and the Cuckoo, or result in the destruction or adverse modification of their designated critical habitat;

2.    Order BLM and the Service to reinitiate and complete consultation on the seven Middle Gila grazing allotments identified above by a date certain;

3.    Order BLM to take the actions necessary to prevent any further adverse impacts to the Flycatcher and the Cuckoo, and their critical habitat, within the seven Middle Gila grazing allotments until BLM and the Service can demonstrate full compliance with the ESA;

4.    Order BLM, in consultation with and with the assistance of the Service, to develop a program for the conservation of endangered and threatened species impacted by BLM's grazing program, including actions to mitigate damage caused by unauthorized permitted cattle to streamside and riparian streamside areas providing habitat (including critical habitat) for the Flycatcher and the Cuckoo on the seven Middle Gila grazing allotments;

5.      Grant Plaintiffs their reasonable attorneys' fees and costs associated with this action, as provided by the ESA, § 1540(g)(4), and/or the Equal Access to Justice Act, 28 U.S.C. § 2412; and

6. Grant Plaintiffs such additional relief as the Court may deem just and proper.

Respectfully submitted November 2, 2023.

<div style="margin-left:40%">

*/s/ Justin Augustine*
Justin Augustine (CA Bar No. 235561)
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
Phone: (916) 597-6189
Email: jaugustine@biologicaldiversity.org
*Pro Hac Vice Application Pending*

*/s/ Edward B. Zukoski*
Edward B. Zukoski (CO Bar No. 26352)
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO 80202
Phone: (303) 641-3149
Email: tzukoski@biologicaldiversity.org
*Pro Hac Vice Application Pending*

*Attorneys for Plaintiffs*

</div>